BROWN, Chief Judge.
 

 In this domestic violence case, defendant, Stanley Lee Reed, was convicted by a jury of attempted second degree murder and one count of aggravated burglary, and by a judge of two counts of aggravated assault. He was acquitted of a second count of aggravated burglary. The parties agreed pretrial that the jury would decide the felony counts and that the misdemeanors were to be decided by the trial court based on the evidence from the jury trial. He was sentenced to 28 years at hard labor -without benefit of parole for attempted second degree murder, 10 years at hard labor for aggravated burglary, and 90 days for each count of aggravated assault. These sentences were ordered to be served concurrently. Defendant has appealed his convictions and sentences. We affirm.
 

 Discussion
 

 Sufficiency of the Evidence
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 01-1658 (La.05/23/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).
 

 Defendant and Tomica Schiele had been married approximately three years when this incident occurred.
 
 [1]
 
 They were living at 4409 South Grand Street in Monroe, Louisiana. About a week before the morning of March 22, 2008, defendant took his clothes and TV and moved out. Tomica stated that she thought the marriage was over so she asked her father, Cleveland Hatten, to move in to help her pay the rent. She also started a romantic relationship with Kevin Robinson, a coworker of her father, who also helped her with her bills. On March 21, Kevin spent the night with Tomica.
 

 On the morning of March 22, defendant returned to the South Grand Street home. Tomica had jammed the front door to prevent defendant from using his key to enter; however, she heard a loud crash and saw defendant coming into the house, having broken the hinges off the front door. She then went to the back bedroom and woke Kevin up. Defendant followed her into the bedroom and told Kevin to leave. Defendant then went into the kitchen and got a knife. She picked up a jack handle lying beside the bed and swung it at defendant. As she ran out of the house, defendant picked up the jack handle and threw it, hitting her in the head.
 

 Tomica ran into the house of her neighbors, Freddie and Sandra Tranchina. Defendant followed her inside and began hitting and stabbing her in the back of the neck and shoulder. She fell to the floor and defendant kicked her in the stomach multiple times. Before he left, defendant picked up a large rocking chair and threw it down on her.
 

 Kevin Robinson confirmed much of what Tomica said. Kevin said that defendant
 
 *1119
 
 stopped him from following Tomica to the Tranehinas’ house by jabbing at him with a knife and telling him to “get back.” Defendant then ran after Tomica into the neighboring house. Kevin went to the Tranchina house, looked in and saw defendant “brutalizing” Tomica. He said that defendant looked up, saw him, and chased him as he ran to another neighbor’s house; Defendant grabbed and tore his shirt as he entered the home.
 

 Cleveland Hatten, Tomica Schiele’s father, was at home and also confirmed much of Tomica’s testimony. He testified that he was living in her house on South Grand Street after defendant moved out. He stated that defendant had taken most of his possessions, including his television. Hatten stated that defendant and Tomica were behind on the rent, so he made an oral agreement with the landlord to move in and pay the rent. Hatten said defendant was in a rage, and after Tomica ran out, he said something to defendant, who swung at him with the knife. Hatten said that if he had not moved he would have been cut. Hatten went to a neighbor’s house to get someone to call the police.
 

 Dennis Coleman testified that he worked at LSU-E.A. Conway Hospital for 30 years and had gone to school with defendant. Coleman said he was heading home from the gym when defendant flagged him down and asked for a ride. Coleman testified that as they were riding, defendant told him that his wife was “messing over me” and that he “caught [his] m-r f-g wife with some f-g n-r,” and that he tried to kill her. Coleman said that defendant showed him the knife, and when he looked down he saw that defendant’s shoes were bloody. Defendant did not have any blood on his clothes. Coleman said he stopped the car and told defendant to get out. On cross-examination, Coleman admitted that he did not tell the detective that defendant confessed that he tried to kill Tomica.
 

 Sandra Tranchina testified that she had lived at 4415 South Grand Street with her husband Freddie for nine years. She stated that Tomica and defendant had lived next door for less than a year. She stated that she had just come home from work when Tomica ran into her house yelling for her to call the police; that defendant ran into the home “a step or two” behind; that defendant did not have permission to enter the home; and, that once inside, he went straight to Tomica, pushed her down, began hitting and stabbing her. Ms. Tranchina attempted to keep the dogs out of the way (she had 8 dogs and 37 cats) while she told her husband to call the police and yelled at defendant to get out of her house. She said that Tomica was stabbed five or six times and that defendant grabbed a rocking chair, and threw it down on her.
 

 Officer Josh Sanson of the Monroe Police Department was waved down by a white female, Ms. Tranchina. He went into the woman’s house located at 4415 South Grand and saw a black female with a stab wound lying on the floor. Officer Sanson called an ambulance company, and they took her away. Det. Holmes investigated the case. Photographs of the scene and of the victim and her wounds were introduced into evidence. On redirect examination, Det. Holmes stated that defendant turned himself in two days after the incident.
 

 Stanley Reed testified against his attorney’s advice. He claimed that he left the matrimonial domicile and went to stay with his mother because Tomica was not taking him to work on time. He took some of his clothes and his television; however, he left his dogs and some other stuff. He stated that he was only at his mom’s for about two days; that he did not know that he
 
 *1120
 
 was not welcome back at the home; that on the morning of March 22, he returned to the South Grand house and unlocked the door with his key; that nothing stopped him from opening the door, which had been broken the week before; that he saw his wife with Kevin Robinson; and, that he told Kevin to leave. He said that Tomica picked up a jack handle; that he then went to the kitchen and got a knife; that he returned to the bedroom; and, that Tomica began hitting him with the jack handle. He raised his arm for protection. He said that he swung back at Tomica and may have cut her with the knife. He said that Tomica dropped the jack handle and ran out to a neighbor’s house. He claimed that he then dropped the knife and ran after her; that he entered the neighbors’ house; that he accidentally bumped Tomi-ca and caused her to fall; and, that Tomica began kicking and punching him so he simply left. He stated that he had no intention of killing or hurting his wife. Defendant claimed that when he left the neighbor’s house, he saw Kevin Robinson and asked to talk with him. After Kevin refused to talk, defendant flagged down Coleman, who dropped defendant off at his friend’s house. He stated that he told Coleman he caught his wife “messing over me”; but said nothing about trying to kill her. He turned himself in when he heard what had happened.
 

 Det. Holmes was recalled by the state. He testified that when defendant surrendered at the police station, and after signing a waiver form, defendant said that his key would not work so he used his shoulder to force the door open, and that Tomi-ca hit his arm with the jack handle. Defendant claimed he did not remember cutting Tomica, and that he dropped the knife somewhere outside of the home. Det. Holmes looked for the knife but was unable to find it in either the house or yard. Det. Holmes specifically looked for cuts and bruises on defendant’s arm from blocking the jack handle but found none.
 

 Attempted Second Degree Murder
 

 Attempted second degree murder requires proof of a specific intent to kill the victim.
 
 State v. Powell,
 
 598 So.2d 454 (La.App. 2d. Cir.1992),
 
 writ denied,
 
 605 So.2d 1089 (La.1992).
 

 Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1).
 

 Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant.
 
 State v. Draughn,
 
 05-1825 (La.01/17/07), 950 So.2d 583,
 
 cert. denied,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
 

 The fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey,
 
 99-0023 (La.01/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
 

 According to the testimony of Cleveland Hatten, Kevin Robinson, and Tomica Schiele, defendant, while armed with a knife, chased Tomica out of her house into the Tranchina home next door. Mrs. Tranchina and Tomica stated that defendant stabbed Tomica multiple times. The knife wounds were on the back of her neck and shoulder. Tomica sustained at least two puncture or stab wounds on her neck and had some marks where defendant sliced at her neck. Dennis Coleman stated that defendant told him that he tried to kill
 
 *1121
 
 his wife. Detective Holmes produced photographs of the wounds.
 

 Defendant’s version differed from that of these witnesses. He claimed self-defense as he swung the knife when Tomica was hitting him with the jack handle. He said the witnesses were untruthful. Alternately, he claims that he acted in sudden passion and that this should mitigate the verdict to manslaughter.
 

 The state bears the burden of proving its case beyond a reasonable doubt. Included in the state’s burden is that the homicide was not perpetrated in self-defense. La. R.S. 14:20 A(l);
 
 State v. Garner,
 
 89,731 (La.App. 2d Cir.09/08/05), 913 So.2d 874,
 
 writ denied,
 
 05-2567 (La.05/26/06), 930 So.2d 19. Manslaughter is a homicide which would be murder but for the fact that it is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La. R.S. 14:31 A(l). The jury must evaluate all the evidence to determine if the state proved that defendant did not act with justification and whether the evidence constrained a manslaughter verdict.
 

 In this case defendant testified. He claimed self-defense and that all of the other witnesses were lying. The jury evaluated the evidence and reasonably concluded that this argument was without merit. The evidence in the light most favorable to the prosecution was sufficient to allow a rational juror to return a guilty verdict on this charge.
 

 Aggravated Burglarg
 

 Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender, (1) is armed with a dangerous weapon; or (2) after entering arms himself with a dangerous weapon; or (3) commits a battery upon any person while in such place, or in entering or leaving such place. La. R.S. 14:60.
 

 Mrs. Tranchina testified that she never authorized defendant to come into her house, which was inhabited by her and her husband. Tomica and Mrs. Tranchina testified that, once in the house, defendant immediately struck, kicked, and cut Tomi-ca as well as used a rocking chair to hit her. This shows that defendant entered the house with the intent to commit a felony. Further, defendant was armed with a dangerous weapon and after entering, armed himself with another dangerous weapon. He came inside with a knife and after entering picked up a large chair to crash down on the victim. Reviewing this evidence in the light most favorable to the prosecution, a trier of fact could have easily found defendant guilty of this crime.
 

 Aggravated Assault of Hatten and Robinson
 

 Aggravated assault is an assault committed with a dangerous weapon. La. R.S. 14:37. Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery. La. R.S. 14:36. Battery is the intentional use of force or violence upon the person of another. La. R.S. 14:33.
 

 As previously stated, the fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 State v. Casey, supra.
 

 Cleveland Hatten testified that defendant swiped at him with a knife, and if he
 
 *1122
 
 would not have moved out of the way he might have been cut. Kevin Robinson testified that when he left the house, defendant jabbed at him with the knife telling him to “get back.”
 

 Defendant denied both of these two events. The trial court did not find defendant credible. The testimony from these two witnesses was sufficient to allow the trial court to find that defendant attempted to batter both Hatten and Robinson.
 

 Excessive Sentence
 

 Defendant claims concurrent sentences amounting to 28 years without benefit of parole are excessive.
 

 A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.
 
 State v. Smith,
 
 01-2574 (La.01/14/03), 839 So.2d 1;
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993). A sentence is considered grossly disproportionate if, when the crime |inand punishment are viewed in light of the harm done to society, it shocks the sense of justice.
 
 State v. Weaver,
 
 01-0467 (La.01/15/02), 805 So.2d 166;
 
 State v. Lobato,
 
 603 So.2d 739 (La.1992).
 

 Attempted second degree murder is punishable by up to 50 years imprisonment at hard labor. Defendant received 28 years which is significantly less than the maximum sentence. Further, although defendant was convicted of multiple crimes, the sentences were ordered to run concurrently; therefore, he received a substantial benefit.
 

 Although the particular wounds in this case were not life threatening, they could have been if they had hit an artery. The PSI includes facts from other arrests, including domestic abuse on this same victim. The PSI reports that defendant has been involved in attacks on at least five separate women. He has reportedly used a knife before and had used a bottle twice in these attacks. Defendant has never served any jail time. These facts show that defendant has a pattern of abusing women and other methods of punishment have not been effective. Defendant was 44 years old and had eight children by four different women. When considering defendant’s history, the facts of this case, and that 28 years is significantly less than the maximum possible sentences, the sentences are not excessive.
 

 Conclusion
 

 For the foregoing reasons, defendant’s convictions and sentences are affirmed.
 

 [1]
 

 . Tomica testified that they went through a marriage ceremony in a church, but she was unsure if the proper papers were submitted.